IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES | * | **FILED UNDER SEAL** |
| | * | |
| v. | * | CASE NO. 8:25-mj-02215-GLS |
| | * | |
| ROBERT MATTHEW SHINES | * | |
| | * | |

✓ FILED ___ ENTERED
___ LOGGED ___ RECEIVED
1:26 pm, Oct 15 2025
AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ____M.G.____ Deputy

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 2022. I am currently assigned to the Baltimore Field Office where my primary responsibility is the investigation of matters involving foreign counterintelligence and espionage. During my tenure with the FBI, I have investigated and participated in investigations involving espionage, economic espionage, and unauthorized disclosures of classified information. In addition, I have conducted surveillance, participated in covert operations, and executed various counterintelligence investigative activities.

2. Since this affidavit is being submitted for the limited purpose of securing authorization for the execution of an arrest warrant, I have not included each and every fact known to me concerning the investigation. I have set forth only the facts that I believe are necessary to support the issuance of the requested process. The statements contained in this affidavit are based, in part, on information gathered through interviews, search warrants, surveillance operations, and conclusions reached by me based upon my training and experience as an FBI Special Agent.

## PURPOSE OF AFFIDAVIT

3. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Robert Matthew SHINES ("SHINES") violated 18 U.S.C. § 794(c) (Conspiracy to Gather or Deliver Defense Information to Aid a Foreign Government). I therefore make this affidavit in support of a criminal complaint charging SHINES with this offense.

1

## STATUTORY AUTHORITY AND DEFINITIONS

4. Under 18 U.S.C. § 794(a), "[w]hoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to communicate, deliver, or transmit, to any foreign government, or to any faction or party or military or naval force within a foreign country, whether recognized or unrecognized by the United States, or to any representative, officer, agent, employee, subject, or citizen thereof, either directly or indirectly, any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, note, instrument, appliance, or information relating to the national defense, shall be punished . . . ."

5. Under 18 U.S.C. § 794(c), "[i]f two or more persons conspire to violate this section, and one or more of such persons do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be subject to the punishment provided for the offense which is the object of such conspiracy."

6. Under Executive Order 13526, the unauthorized disclosure of material classified at the "TOP SECRET" level ("TS"), by definition, "reasonably could be expected to cause exceptionally grave damage to the national security" of the United States. Exec Order 13526 § 1.2(a)(1), 75 Fed Reg. 707, 707-08 (Jan. 5, 2010). The unauthorized disclosure of information classified at the "SECRET" level ("S"), by definition, "reasonably could be expected to cause serious damage to the national security" of the United States. Exec. Order 13526 § 1.2(a)(2). The unauthorized disclosure of information classified at the "CONFIDENTIAL" level ("C"), by definition, "reasonably could be expected to cause damage to the national security" of the United States. Exec. Order 13526 1.2(a)(3).

7. Sensitive Compartmented Information ("SCI") is classified information related to intelligence sources, methods, and analytical processes. SCI is to be processed, stored, used, or discussed in an accredited Secured Compartmented Information Facility ("SCIF"), and only individuals with the appropriate security clearance and additional SCI permissions are authorized to access such classified national security information. For a foreign government to receive access to classified information, the originating United States agency must determine that such release is appropriate.

8. Pursuant to Executive Order 13526, information classified at any level shall be lawfully accessed only by persons determined by an appropriate United States government

2

official to be eligible for access to classified information, who has signed an approved non-disclosure agreement, who has received a security clearance, and who has a "need to know" the classified information. Classified information shall only be stored or discussed in an approved facility.

## PROBABLE CAUSE

9. Robert SHINES is a U.S. citizen who resides in Hyattsville, Maryland in the District of Maryland. SHINES identifies himself as the president of Pacific Strategic Intelligence LLC, where he says he provides "strategic advisory services" relating to United States-China relations. He previously identified himself on an online professional networking platform as a U.S. foreign policy analyst and project manager.

10. The People's Republic of China ("PRC") Intelligence Services ("PRCIS") encompass both the civilian and military components of the PRC intelligence program. Civilian intelligence collection is handled by the Ministry of State Security ("MSS"). The MSS can be described as an institution similar to the FBI and the Central Intelligence Agency ("CIA") combined under one intelligence directorate responsible for counterintelligence, foreign intelligence, and political security. The MSS consists of a central ministry, provincial state security departments, and municipal state security bureaus. Among other things, the MSS and its regional bureaus are focused on identifying and influencing the foreign policy of other countries, including the United States. The MSS and its bureaus seek to obtain information on political, economic, and security policies that might affect the PRC, foreign intelligence operations directed at the PRC, and biographical profiles of foreign politicians and intelligence officers.

11. Additionally, the MSS and its bureaus are tasked with conducting clandestine and overt human source operations, of which the United States is a principal target. These operations use trained intelligence officers as well as non-professional collectors called "co-optees." A co-optee is a person trusted by both the source and the intelligence officer who helps to provide a layer of insulation between an intelligence officer and a source, thereby increasing operational security. Co-optees can operate under a variety of covers, posing as diplomats, journalists, academics, or businesspeople, both at home and abroad. These individuals are often tasked with spotting, assessing, targeting, collecting, and handling sources or assets with access to classified, open-source, proprietary, or sensitive information that the PRC government can utilize for economic, political, or military decision-making or advantage. Sources or assets are people who

agree to help a foreign intelligence service by providing information to that service in response to taskings or requests from its intelligence officers or agents.

### SHINES's Repeated Travel to China

12. Travel records show that SHINES traveled to China and/or Hong Kong at least seven times between 2017 and the present.

13. On or about May 12, 2025, after a return flight to the United States from Hong Kong, SHINES was subjected to a U.S. Customs and Border Protection ("CBP") secondary inspection and interview by CBP at Chicago O'Hare International Airport. During the interview, SHINES stated, *inter alia*, that he had only traveled to Hong Kong on this trip, that his travel was for vacation and to relax, and that he did not meet with anyone else while on this trip. However, a review of SHINES's passport revealed entry and exit stamps for mainland China dated May 7, 2025, and May 10, 2025, respectively, contradicting his statement. When asked by a CBP officer why he did not mention that he traveled to mainland China, SHINES did not provide a responsive answer. Instead, he stated that he traveled to Zhuhai, China alone for vacation, was only there for tourism, and did not meet with anyone. However, the FBI's investigation revealed that Shines repeatedly communicated with an individual about his travel arrangements to Zhuhai, including communications during which SHINES was informed what hotel he would be staying at.

### SHINES Sought to Recruit U.S. Persons to Provide
### Sensitive U.S. Government Information

14. Pursuant to court-authorized legal process, the FBI has reviewed SHINES's communications with an individual identified as Co-Conspirator #1 ("CC-1"). In an exchange commencing on or about June 11, 2021, CC-1 informed SHINES that he worked for a policy research center based in Taiwan and that he hoped SHINES "can be part of our research team" by serving as a "special consultant, writing consultation reports, or providing consulting services for us." CC-1 explained, "We prefer you mostly to recommend federal employees" to serve as consultants or researchers and noted that the most important requirement was that "the information and analysis in your report should be exclusive" and stated, "We don't need basic background introduction or information that the general public all knows."

15. When SHINES asked about compensation, CC-1 responded that if SHINES could identify the employees they needed and "help us to build a successful partnership with them," SHINES would receive $500 to $1,500 for the recommendation, and stated, "we don't set a limit

4

on the final sum for you as long as you can provide higher and higher quality of topic reports we need." CC-1 further explained, "We are willing to offer remuneration with no upper limit for the high quality report with exclusive and profound insights." In subsequent communications, CC-1 stated that they would accept former federal government workers, but reiterated, "Still, we're also interested in Federal employees, especially the advisors to the government" and that other categories of consultants "such as university scholars, think-tank researchers, etc., they're not under our consideration." SHINES and CC-1 also communicated via an encrypted messaging application.

*Individual #1*

16. In or about March 2022, SHINES used an online professional networking platform to contact a U.S. government SECRET-level clearance holder, identified herein as Individual #1, who worked as a contractor at the Missile Defense Agency ("MDA"). SHINES and Individual #1 were in contact via telephone approximately five times between in or about March 2022 and April 2023. SHINES and Individual #1 were in contact via email approximately twenty-seven times between in or about March 2022 and April 2022. On or about April 1, 2022, an email was sent from Individual #1's contractor email address to Individual #1's personal email address, and approximately three minutes later, an email was sent from Individual #1's personal address to SHINES.

17. Less than one week later, on or about April 7, 2022, financial records show that SHINES signed a $1,000 check to Individual #1 on behalf of the predecessor entity for Pacific Strategic Intelligence. The check referenced "AEGIS PROJECT." The FBI's investigation revealed that AEGIS was a weapon system on U.S. Navy warships that appears to have been related to Individual #1's MDA work.

18. Between on or about April 12, 2022, and on or about May 17, 2022, SHINES and Individual #1 exchanged approximately nineteen emails. On approximately four occasions, emails were sent from Individual #1's contractor address to Individual #1's personal address, and minutes later, an email was sent from Individual #1's personal address to SHINES. During that period, SHINES signed a $2,000 check to Individual #1, dated April 30, 2022, referencing "THAAD AND ROK PROJECT" and a $2,000 check dated June 7, 2022, referencing "DOG PROJECT." The FBI's investigation revealed that both referenced topics were related to sensitive

5

MDA information and that Individual #1 could not share information about these projects with individuals outside MDA.

19.     On or about May 31, 2022, Individual #1 stopped working for MDA. In or about June 2022, Individual #1 started working for a defense contractor. In or about October 2022, Individual #1 obtained a TOP SECRET security clearance. Between in or about June 2022 and in or about March 2025, Individual #1 and SHINES exchanged approximately 47 emails. Individual #1 also continued receiving checks from SHINES with memo lines referencing topics relating to missile projects, information about the defenses of the United States and its allies, and U.S. military chain-of-command systems. As of March 2025, Individual #1 had received approximately 26 checks from SHINES totaling $37,800.

### SHINES's Efforts to Obtain Classified Information

20.     Additional communications obtained pursuant to legal process show that on or about September 30, 2024, SHINES communicated with an individual identified as Co-Conspirator #2 ("CC-2") regarding the cost of the professional networking site's premium membership for recruiters. Based on these communications, SHINES appears to have sought CC-2's authorization to use the website to recruit U.S. persons. CC-2 indicated that he would pay SHINES $2,000 "for now" and instructed SHINES to "pls continue to find new ones. When there is new needs, pls let me know," in an apparent reference to new recruits.

21.     SHINES and CC-2 communicated about SHINES's business expenses associated with his recruitment of U.S. persons. For example, between on or about April 19, 2025, and on or about April 22, 2025, SHINES and CC-2 exchanged a series of messages about business expenses in which SHINES referenced "your client" and said, "If they wanted me to recruit more candidates on [commercial job search sites], take them for lunch, pay them for various projects, and pay me at the same time, they should have given me more than $45,000 last time." SHINES referenced payments for, *inter alia*: projects such as "Restoring Trade Fairness" and "Taiwan WHO follow-up," lunch with a recruit, and payments for an "HK hotel" from May 5-7, 2025, and from May 10-12, 2025. The dates of the hotel payments correspond to SHINES's trip to Hong Kong from May 4 to May 12, including a gap corresponding to his May 7 to May 10 trip to mainland China. The fact that SHINES itemized these hotel payments for CC-2 indicates that he traveled to Hong Kong in May 2025 for business purposes, notwithstanding his statements to

CBP officers that the trip was for vacation and to relax. In response, CC-2 thanked SHINES for his "careful efforts."

22. Additional communications obtained pursuant to legal process demonstrate that SHINES and CC-2 discussed classified information and actively strategized about how to obtain "C info" from the individuals recruited by SHINES. For example, on or about December 5, 2024, SHINES sent CC-2 a report summarizing a lunch meeting with Individual #1, who worked for a U.S. government contractor. In the report, SHINES stated that Individual #1 "is also seeking Top Secret/SCI (Secure Compartmentalized Information) clearance as one of the subcategories within the Top Secret category." SHINES noted that Individual #1 "says that he would not share classified information." SHINES sent the lunch report via an encrypted messaging application and informed CC-2 in an accompanying message, "He said no."

23. On or about the next day, December 6, 2024, SHINES wrote to CC-2 "I misjudged [Individual #1]. He's a soldier who believes in something bigger than himself. That's why his country trusted him with a security clearance in the first place. He's very similar to you, your colleagues, and your client. And that's why your country trusts all of you with your various security responsibilities. [He's] not like me, some piece-of-shit mercenary businessman who only believes in money. And that's why I'd never be able to get a security clearance myself and work for the government."

24. CC-2 responded, "pls don't say that for yourself… you deserve my respect from an even bigger picture. Anyway, I would like to extend my sincere gratitude to you for all your efforts."

25. In the leadup to this December 2024 exchange, SHINES and CC-2 had repeatedly discussed efforts to obtain "C info" from Individual #1. For example, on or about July 11, 2024, SHINES forwarded a message from Individual #1 in which he mentioned that his employer supported a program "[t]hat is mostly a classified system . . . [s]o can share limited info." In an accompanying message, SHINES referenced other programs and said, "I suggest we try the other 2 later as they look classified too." Later in the exchange, CC-2 asked SHINES, "What are your thoughts bro, which topic should we give him first, to let him give us some C info." SHINES suggested they start with a particular program "[a]nd no follow-up questions. Would suggest if your client has any, I can meet him in person." CC-2 replied, "do you have any good suggestions on how to ask, I think good design of questions will lead to good answer…we two both think

about this very carefully, and we discuss." SHINES replied, "No. I thought your client already had questions for each of the four possible topics." CC-2 responded, "ok, will ask them and send you the questions. Then you help check questions to see if they are suitable to get C info."

26. On July 14, 2024, CC-2 sent SHINES a "draft questions list" and asked him to "please help to check it and see whether they are suitable to send to" Individual #1. SHINES rejected one question as "too sensitive" and said that another question "may be doable if I leave out military part and incorporate the rest into another question." In this exchange, SHINES noted that "if [Individual #1] is to provide C info in a report, there's a risk he may be obligated to report back to DSCA (Defense Security Cooperation Agency). Please confer with your client on how to proceed."

27. On July 16, 2024, CC-2 wrote to SHINES, "I have discussed this with the client. We both believe your worries is reasonable, and we also analysed [sic] the cooperation with him from the beginning, the conclusion is that he won't do that…. He always sends us news only it [sic] gets public. From this point, he is very clever and cherishes his job very much. If he reports this, for sure he will lose his job. Based on suggestions provided by SHINES, CC-2 also noted, "We have improve [sic] the questions and make them look normal."

28. In a follow-up message, SHINES stated, "it is not a good idea to state outright your client's final goal with him, just as they did with me. This first time will be a trial run that your client can use to judge his suitability for future such projects. Lastly, please tell your client to follow my other previous suggestions of shuffling c projects, in other words, not c, c, c, c, c, but c, non-c, non-c, non-c, c, or something close to that. Please also shuffle topic focus areas.". CC-2 responded, "totally agree with you bro, my top priority is protect you [sic]… Pls do not state outright our final goal with him…. We do this step by step. Then we see what content he can give us."

*Individual #2*

29. In or about August 2022, SHINES contacted another individual, identified herein as Individual #2, who previously served as an intelligence analyst for the U.S. Marine Corps and later as an intelligence analyst for a U.S. government contractor and who maintains an active TOP SECRET security clearance. Between on or about November 18, 2022, and April 14, 2023, SHINES and his company sent Individual #2 six wire transfers totaling $6,000. After these payments were made, SHINES began to pay Individual #2 via a commercial payment application

8

and transferred a total of $6,100 between in or about April 2023 and August 2023. Comments that accompanied multiple transaction records referred to military-related projects.

30.     On or about August 7, 2023, Individual #2 emailed himself a list of questions. The body of the email referenced a "new project" and listed a due date of August 14, 2023. The questions appear to relate to an annual Taiwanese military exercise known as the Han Kuang exercise, and to focus on the Taiwanese military's ability to protect itself against an invasion from the PRC, the United States military's involvement in a simulated attack on a specific target, and lessons Taiwan could learn from Russia's recent invasion of Ukraine.

31.     Investigators also identified three emails sent by Individual #2 to SHINES at two different email addresses. In two of these emails, dated on or about August 15, 2023, and on or about August 16, 2023, Individual #2 attached two documents that related to the Han Kuang Exercise and appear to be a direct response to the questions Individual #2 had emailed to himself.

32.     Evidence obtained pursuant to legal process shows that Individual #2 appears to have drafted and retained electronic copies of multiple white papers. One such document appears to have been authored by Individual #2 using his/her official U.S. military account. This document included verbatim or near verbatim excerpts from a U.S. government document classified at the SECRET//NOFORN level. NOFORN is a classification marking that indicates that a document is not releasable to foreign nationals.

*Individual #3*

33.     On or about February 27, 2025, SHINES and CC-2 discussed another individual, identified herein as Individual #3, who previously worked for the U.S. Department of Commerce. SHINES and CC-2 conversed about the appropriate payment if Individual #3 could provide the "full c version" of a document related to the White House. SHINES told CC-2, "I believe [Individual #3] already told me the original White House report is c, but I'll try again. How much for the extra money?" CC-2 responded, "If [Individual #3] can give the full c version, at least 5000~10000."

*Individual #4*

34.     On or about March 19, 2025, the FBI conducted a voluntary interview with another individual, identified herein as Individual #4, who previously worked for two members of the United States Congress. Individual #4 stated that he responded to a job posting on an employment recruiting website for a consultant position with Pacific Strategic Intelligence LLC. On or about

March 10, 2025, Individual #4 was contacted by SHINES, and on or about March 12, 2025, Individual #4 spoke with SHINES via telephone. During the call, SHINES told Individual #4 that he represented clients from small, medium, and large companies in China, India, and the Republic of Korea (South Korea). When pressed about the identities of his clients, SHINES responded that his clients were confidential.

35. SHINES told Individual #4 that he had 19 individuals working for him, including contractors. SHINES stated that some of the people on the payroll had U.S. government security clearances, but most did not. SHINES described these individuals as people in government who wanted a "side gig." SHINES said that one contractor worked for the U.S. Department of Commerce, and another worked for the U.S. Department of the Treasury. SHINES also described himself to Individual #4 as a former U.S. government employee and noted that he previously worked for the General Services Administration in 1992 and for a local government in Chicago.

### SHINES's Receipt of Covert Courier Payments

36. An FBI analysis of SHINES's communications with CC-2 shows that SHINES coordinated with CC-2 to receive tens of thousands of dollars in cash via covert courier payments. For example, on or about December 6, 2024, CC-2 told SHINES that he wanted "to transfer some budget to you" and asked SHINES if he could "do a survey about the similar place that you meet [sic] my friend earlier this year?" SHINES responded, "So choose different places, not the same place, right?" and CC-2 confirmed. SHINES wrote that there was "[o]nly one park left." On or about December 20, 2024, CC-2 indicated that he had given the budget to "my friend" when the friend was "at home," but said that "in your home, he needs to get ready for that number, so it will take some weeks." On or about January 19, 2025, CC-2 proposed that SHINES receive the "budget" payment on January 25, 2025. SHINES asked to do it "as early as possible" on that date because "[t]he bank closes at 12 on Saturdays." In response, CC-2 asked, "is it ok to put it in the bank bro?" SHINES responded, "when I say take it to the bank, I mean put it in the safety deposit box myself. I never give it to a worker."

37. On or about January 21, 2025, CC-2 sent SHINES a message confirming the date, time, and location of the meeting, which was to be held at an identified park in suburban Maryland. SHINES stated, "I'll meet him then at the park, wearing the same blue jacket and carrying the same brown bag as before. Is there a special code phrase?"

38. On the day of the meeting, on or about January 25, 2025, SHINES and CC-2 exchanged a series of messages about the meeting. CC-2 provided answers to SHINES's questions about the color and license plate of the car and a "code" question and answer. However, CC-2's answers to these particular questions were subsequently deleted by SHINES or CC-2. After the exchange, SHINES confirmed that he "[j]ust got money and am leaving to go back home now" and that "[s]he did not have [the] question but gave me money anyway. Tell her I said thanks for worrying about me. You too." SHINES also wrote, "it has to be quicker next time. After I got the money, some police showed up in the parking lot. They didn't talk to me, but somebody probably thought I looked suspicious and called them because I had been waiting in the park for so long." SHINES also confirmed that he had received the entire $40,000, stating "Count confirmed at 40K and will deposit in safety deposit box Monday morning."

39. SHINES's email account contained a document with photos titled "Park Report," that, as stated in the document, "details the three closest, most secluded parks near the" bank with SHINES's safety deposit box. SHINES noted that the most secluded park had "no people or houses nearby," indicated the bench to meet at, and included a photo of the bag he would be carrying. Another document detailing SHINES's 2025 business expenses further corroborated the meeting at the park and listed expenses for his safety deposit box fee and for rideshare rides to the meeting location and the bank housing the safety deposit box.

40. Another document reflecting SHINES's 2024 business expenses indicates that he also received funds through another courier meetup that took place in May 2024, with expense notations reflecting rideshare expenses to the park to "Get Budget" and to his safety deposit box.

### SHINES's Further Use of Counterintelligence Tradecraft

41. In addition to the evidence detailed above, in his communications with CC-2, SHINES demonstrated an awareness of counterintelligence tradecraft and repeatedly discussed concerns about detection and his efforts to evade law enforcement.

42. For example, on or about July 17 and 18, 2024, SHINES wrote CC-2 to say that "[d]ue to SMT/NIS situation, best to meet only for periodic poly…. Menendez sit too." SHINES asked CC-2 to "[p]ls confer with client." When CC-2 asked what he meant, SHINES clarified that he was referencing the federal criminal charges against Sue Mi Terry and Senator Robert Menendez and described them as "both accused agents. Understand?" CC-2 responded "sorry bro, I understand now…. Pls take care." On July 16, 2024, Sue Mi Terry was arrested in the Southern

11

District of New York on charges of acting as an unregistered agent of the Republic of South Korea and its National Intelligence Service (NIS). The same day, former U.S. Senator Robert Menendez was convicted at trial on charges that included illegally acting as an agent of the Government of Egypt. Based on my training and experience, I believe that "poly" is a potential shorthand for a polygraph examination.

43. Likewise, on or about July 23, 2024, SHINES wrote CC-2 to express his "fear that maybe DSCA had [Individual #1] running counterintel on me."

44. Between on or about October 15, 2024, and on or about October 20, 2024, SHINES traveled to Hong Kong, during which he made a side trip to Hainan, China. On or about October 20, 2024, the date SHINES returned to the United States from Hong Kong, SHINES wrote a message to CC-2 in which he said, "please tell Mr. Lee it was nice meeting him to get clearer directions." On or about November 11, 2024, SHINES sent CC-2 a message in which he noted, "I'd never be able to get a [U.S.] security clearance with a polygraph test since I've now formally met your client."

45. On or about March 13, 2025, SHINES sent a message to CC-2 in which he stated, "I understand your client's need for safety with cash transfers and safety deposit boxes. But if the company is to appear truly legitimate, then payments to me also have to appear legitimate, just like when I pay people for projects."

46. On or about March 26, 2025, SHINES sent CC-2 a news article titled "Secretive Chinese Network Tries to Lure Fired Federal Wo[rkers]" and stated, "The risk is rising here for me, and this is untenable."

## CONCLUSION AND SEALING REQUEST

47. For the reasons stated above, there is probable cause to believe that from in or about June 11, 2021, to in or about May 12, 2025, with the intent to and reason to believe it would be used to the injury of the United States and to the advantage of a foreign nation, SHINES conspired with Co-Conspirator #1, Co-Conspirator #2, and others, to obtain and willfully communicate, deliver, and transmit documents, writings, code books, signal books, sketches, photographs, photographic negatives, blueprints, plans, maps, models, notes, instruments, appliances, and information relating to the national defense to representatives, officers, agents, employees, subjects, and citizens of the foreign nation, in violation of 18 U.S.C. § 794(c). These criminal violations were either begun or committed in the District of Maryland, or were begun or

12

committed overseas, out of the jurisdiction of any particular state or district, and your affiant expects that SHINES will be arrested in the District of Maryland.

48. I ask that this affidavit be sealed, until further order of the Court, to protect this investigation. I am aware from my training and experience that evidence is destroyed, individuals flee, and witnesses may be tampered with or become uncooperative when the details known to law enforcement become prematurely available to the targets of a criminal investigation.

49. This concludes my affidavit.

Meredith Salmon, Special Agent
Federal Bureau of Investigation

Affidavit submitted by email and sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on October 15, 2025

The Honorable Gina L. Simms
United States Magistrate Judge